# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | **Criminal No. 08-014 (MJD/SRN)** |
| **Plaintiff,** | |
| **v.** | **REPORT AND RECOMMENDATION** |
| **Christian Hernandez-Seldana (01), Ramiro Cuevas-Martinez (02), Eddy Medina-Garza (03), Feliz Murguia-Garcia (04), and Phat Minh Nguyen (05),** | |
| **Defendants.** | |

_____

Steven L. Schleicher, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Richard J. Malacko, Gray & Malacko, 332 Minnesota Street, Suite W 1610, St. Paul, Minnesota 55101, for Defendant Christian Hernandez-Seldana

Jordan S. Kushner, Law Office of Jordan S. Kushner, 431 South Seventh Street, Suite 2446, Minneapolis, Minnesota 55415, for Defendant Ramiro Cuevas-Martinez

Andrea K. George, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant Eddy Medina-Garza

Glenn P. Bruder, Mitchell Bruder & Johnson, 4005 West 65th Street, Suite 200, Edina, Minnesota 55435, for Defendant Feliz Murguia-Garcia

John L. Lucas, Attorney at Law, 247 Third Avenue South, Minneapolis, Minnesota 55415, for Defendant Phat Minh Nguyen

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Christian Hernandez-Seldana's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 57), Motion to Suppress Statements (Doc. No. 58), Motion to Suppress Government Interception of Wire or Oral Communications (Doc. No. 59), and Motion

to Suppress Eyewitness Identifications (Doc. No. 61); Defendant Ramiro-Cuevas's Motion to

Suppress Statements (Doc. No. 84), Motion to Suppress Evidence from Search and Seizure (Doc.

No. 85), Motion to Suppress Witness Identifications (Doc. No. 86), and Motion to Suppress

Wiretap Evidence (Doc. No. 88); Defendant Eddy Medina-Garza's Motion to Suppress

Eyewitness Identifications (Doc. No. 42), Motion to Suppress Evidence Obtained from Search

and Seizure (Doc. No. 46), and Motion to Suppress Statements (Doc. No. 47); Defendant Feliz

Murguia-Garcia's Motion to Suppress Statements (Doc. No. 67) and Motion to Suppress

Evidence Derived from Electronic Surveillance (Doc. No. 68); and Defendant Phat Minh

Nguyen's Motion to Suppress (Doc. No. 91), Motion to Dismiss Conspiracy Counts (Doc. No.

92), Motion to Suppress Statements (Doc. No. 98), and Motion to Suppress Wiretap Evidence

(Doc. No. 101).[1]  This case has been referred to the undersigned for resolution of pretrial matters

pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

## I.    BACKGROUND

An Indictment was filed on January 14, 2008, charging Defendants Christian Hernandez-

Seldana, Ramiro Cuevas-Martinez, Eddy Medina-Garza, Feliz Murguia-Garcia, and Phat Minh

Nguyen with one count of conspiracy to distribute and to possess with intent to distribute heroin

and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  This Court held a

pretrial motions hearing on March 3, 2008, at which Drug Enforcement Administration (DEA)

Agents Tyrone Guyse and Terrence Olstad testified.  The Court also received fifty-one exhibits

into evidence.  Due to the witnesses' inability to testify regarding eyewitness identifications of

---

[1] The Court will address Defendants' pending non-dispositive motions in a separate Order.

Defendants from photographic lineups, the hearing was continued to March 12, 2008.  Agents

Guyse and Olstad also testified at the second hearing, and the Court received seven additional

exhibits into evidence.

## II.     FACTS

The following facts were elicited from the testimony and exhibits introduced at the

hearings.

### A.     The Wiretaps

In May 2007, the Minneapolis Police Department began investigating a large-scale

heroin trafficking organization believed to be based in Mexico ("the Marcos organization").

Agents Guyse and Olstad participated in the investigation as part of a joint effort with the DEA.

Based primarily on information obtained from confidential informants, investigators identified

telephone number (612)501-8362 as a "dispatch telephone" used to contact thousands of

suspected heroin customers in Minneapolis.  Officers learned that this telephone number was

registered to a "Jose Ramos," but they were unable to locate any such person in police or public

databases.  Officers also determined that the telephone number was affiliated with a pre-paid

cellular phone.  In Agent Guyse's experience, such phones are frequently used by narcotics

traffickers because they can register a pre-paid phone in a fictitious name.

By October 2007, the investigation had stalled, and law enforcement officers decided to

apply for a wiretap.  Agent Guyse prepared the affidavit in support of a wiretap application.

(Gov't Exs. 1, 2.)  In the affidavit, he explained how law enforcement had identified the target

telephone number and developed probable cause to believe that the target subjects had

committed and would continue to commit numerous offenses, including the offense of

conspiracy to possess with the intent to distribute, and to distribute, cocaine and heroin.

Defendant Hernandez-Seldana was named as one of the target subjects. Agent Guyse also

explained that a wiretap was necessary because traditional investigative techniques such as the

use of confidential informants and surveillance had not revealed the source of heroin, the names

of "runners" who were distributing the heroin, or the nature and scope of the Marcos

organization. Agent Guyse further explained how the interception of calls to and from the target

phone would reveal information such as the nature and extent of the Marcos organization, the

identities and roles of suppliers and co-conspirators, the locations used to store narcotics, the

locations of records and funds, and the source of the heroin. The Honorable Michael J. Davis,

United States District Judge, signed an order authorizing the wiretap on October 25, 2007.

(Gov't Ex. 3.)

 Before any calls were intercepted, all agents received instructions on monitoring and

minimizing calls. Part of the training included reading a memorandum prepared by Assistant

United States Attorney Steven Schleicher. (Gov't Ex. 5.) The memorandum provided detailed

instructions on spot monitoring, terminating the interception of privileged calls, maintaining

logs, and protecting recordings.

 Throughout the monitoring, Mr. Schleicher provided periodic updates to the court.

(Gov't Exs. 6, 7, 8.) Monitoring agents intercepted over 20,000 calls, of which eighty to ninety

percent were considered "pertinent," meaning that they related to the trafficking of heroin and

cocaine. After the wiretap order expired on November 23, 2007, Agent Guyse brought the disk

containing the calls to Judge Davis, who issued an order sealing the disk. (Gov't Ex. 9.)

 Law enforcement officers decided to seek authorization for a second wiretap because all

4

of the goals of the investigation were not achieved during the first wiretap.  Specifically, they had not learned the source of heroin, the method of transporting the heroin to Minnesota, how the money was transmitted to Mexico, or important details about the Marcos organization's command and control.  Agent Olstad drafted the affidavit in support of the second wiretap application (Gov't Ex. 46), and following a procedure similar to that for the first wiretap, Judge Davis authorized the second wiretap on December 3, 2007 (Gov't Ex. 47).  As before, monitors were trained on the interception of calls, and Mr. Schleicher provided periodic reports to the court.  Monitoring ceased on December 20, 2007.

### B.    The Search Warrants

Based on information collected from the wiretaps and other investigative techniques, Agent Guyse prepared a master affidavit (Gov't Ex. 10) in support of nine search warrant applications (Gov't Exs. 11, 14, 17, 20, 23, 26, 29, 32, 35).  Agent Guyse sought permission to search 6007 Main Street NE, Fridley, Minnesota, which was the residence of Defendant Hernandez-Seldana, and 6215 64th Avenue North, Brooklyn Park, Minnesota, which was a suspected narcotics stash house.  He also sought warrants to search a maroon Cadillac, which Defendant Hernandez-Seldana drove, and six other vehicles used by suspected members of the Marcos organization to deliver and store narcotics: a black Saturn, a blue Ford Taurus, a green Ford Contour, a gold Mazda 626, a black Ford Escort, and a white Ford Expedition.  The Honorable Janie S. Mayeron, United States Magistrate Judge, signed the nine warrants on December 19, 2007.  (Gov't Exs. 12, 15, 18, 21, 24, 27, 30, 33, 36.)

Agent Guyse personally participated in executing three of the search warrants at the Fridley address on December 20, 2007.  A Spanish-speaking officer knocked and announced the

officers' presence and purpose, as did an English-speaking officer.  No one responded to the knock.  After thirty to forty-five seconds, officers forced open a rear door and entered the house. Officers found several people, including Defendant Hernandez-Seldana, in the house and secured them.  Officers also seized numerous items pursuant to the warrant.  Agent Guyse asked to speak with Defendant Hernandez-Seldana, but he asked for a lawyer, and no further conversation occurred.  Officers located the maroon Cadillac and blue Taurus inside the garage of the Fridley house and searched those vehicles pursuant to the respective warrants.

Agent Olstad participated in the execution of the search warrant at 6215 64th Avenue North in Brooklyn Park, Minnesota, on December 20, 2007.  Officers knocked and announced their purpose and presence in English and Spanish.  No one answered, and the officers forced open the door.  Three people, including Defendant Cuevas-Martinez, were found sleeping in an upstairs bedroom.  Based on his review of surveillance video of controlled buys in which Defendant Cuevas-Martinez had sold narcotics, Agent Olstad arrested Defendant Cuevas-Martinez.  Agent Olstad searched Defendant Cuevas-Martinez incident to arrest and found heroin in his pants pocket.  Officers also located and searched the gold Mazda 626 and the black Ford Escort pursuant to the corresponding warrants.

**C.      Defendant Nguyen's Arrest, Statements, and Consent Search**

On January 23, 2008, Agent Guyse and another officer went to the home of Defendant Nguyen at 1381 White Bear Avenue in St. Paul, Minnesota.  The officers intended to arrest him pursuant to a federal arrest warrant that had been issued after the Indictment was filed in this case.  Agent Guyse knocked on the door, and Defendant Nguyen stepped out on the porch. Agent Guyse identified, arrested, and handcuffed Defendant Nguyen.  Agent Guyse then read

6

Defendant Nguyen his <u>Miranda</u> rights and asked if he would speak to the officers and consent to a search of his residence. Defendant Nguyen agreed to both and signed a consent-to-search form. (Gov't Ex. 38.)

The first interview of Defendant Nguyen occurred at approximately 11:02 a.m. at his residence. Defendant Nguyen said that he began buying heroin from the Marcos organization in late 2006. He also discussed a friend of his from Vermont who had died while using heroin with Defendant Nguyen. Agent Guyse showed Defendant Nguyen four photographic lineups and said that the targets of the investigation may or may not be in the lineups. Defendant Nguyen identified Defendant Hernandez-Seldana immediately. He also identified Defendant Medina-Garza after hesitating for a few seconds over a difference in facial hair. Throughout the interview, Defendant Nguyen cooperated fully with the agents. He did not appear to be under the influence of drugs or alcohol, and he appropriately answered questions. He did not ask for an attorney or invoke his right to remain silent. Officers who searched Defendant Nguyen's house seized a large quantity of marijuana.

Agent Guyse transported Defendant Nguyen to the federal courthouse about 2:00 p.m. Defendant Nguyen made casual conversation on the way, such as discussing the lack of heroin in Vermont. Agent Guyse did not repeat the <u>Miranda</u> warning. After they arrived at the courthouse, Defendant Nguyen was interviewed by Pretrial Services.

Following the Pretrial Services interview and just prior to Defendant Nguyen's initial appearance at 3:00 p.m., Agent Guyse asked Defendant Nguyen if he had purchased the heroin he used in Vermont from the Marcos organization. Defendant Nguyen said he had. Defendant Nguyen then made his initial appearance in court, and Agent Guyse learned that Defendant

Nguyen was represented by counsel in a Vermont case and had retained John Lucas to represent him in this case.

**D.     Photographic Lineups and Eyewitness Identifications**

Agent Olstad created photographic lineups of Defendants Murguia-Garcia, Cuevas-Martinez, and Medina-Garza, using the booking photographs taken by the United States Marshals Service when Defendants were arrested in December 2007.  Agent Olstad utilized a computer program to select five other photographs for each lineup.  The program allows an officer to enter descriptive criteria such as race, gender, height, and weight.  Agent Olstad chose photographs of men with appearances similar to each Defendant.  Government Exhibit 54 is a six-person lineup containing a photograph of Defendant Murguia-Garcia.  Government Exhibit 55 is a six-person lineup containing a photograph of Defendant Cuevas-Martinez.  Government Exhibit 56 is a six-person lineup containing a photograph of Defendant Medina-Garza.

Another officer created Government Exhibit 53, which is the photographic lineup containing a picture of Defendant Hernandez-Seldana.  The picture of Defendant Hernandez-Seldana is a booking photograph from the summer of 2007, rather than his booking photograph from December 2007.

Although each of Exhibits 53, 54, 55, and 56 contains an answer key on the second page, the key was not shown to any of the witnesses interviewed by law enforcement.  In addition, some of the answer keys reflect names other than those listed on the Indictment.  Agent Olstad explained that this disparity can occur when a person has previously been arrested under a different name, or if the person gives an alias when he is booked.  Agent Olstad also said that when he compiled the lineups, he did not notice whether the shape of a photograph was slightly

8

different from the others, such as the photograph of Defendant Murguia-Garcia in Exhibit 54.

On January 9, 2008, Agent Guyse interviewed a witness he identified by the initials "WJN." Prior to showing WJN any lineups, Agent Guyse told him that he had been intercepted on a wiretap arranging to buy heroin and cocaine from an organization in Minneapolis. WJN began to talk about Defendant Hernandez-Seldana. Agent Guyse said that the investigation was ongoing, and that the person under investigation may or may not be in the lineup. He then showed WJN the lineup containing the photograph of Defendant Hernandez-Seldana. WJN immediately identified Defendant Hernandez-Seldana as a person he knew as "Marcos." WJN said that a friend had given him the target telephone number in case he wanted to buy narcotics and told him that a runner would bring him the heroin. WJN said that he had met Marcos personally and more than once in this capacity, within the past few months. WJN was certain of the identification.

On January 10, 2008, Agent Guyse interviewed a witness he referred to as "RAS." Prior to showing RAS any lineups, Agent Guyse informed her that the person under investigation may or may not be in the lineups. Agent Guyse then showed Exhibit 53 to RAS, who identified Defendant Hernandez-Seldana as "Marcos," with no hesitation or uncertainty. RAS said that she had purchased cocaine and heroin directly from Marcos about three times in 2007. Agent Guyse also showed RAS Exhibit 57, which is a single picture of Defendant Murguia-Garcia. Although the exhibit contains identifying information on the side of the photograph, Agent Guyse folded and obscured this part of the paper. RAS said that she had purchased narcotics from Defendant Murguia-Garcia about 100 times and knew him as "Felix." She did not hesitate or show uncertainty. Government Exhibit 58 is a single picture of Defendant Medina-Garza, with

9

identifying information on the side of the page.  Agent Guyse also showed RAS this exhibit, obscuring the information, and RAS said she recognized Defendant Medina-Garza as someone from whom she had purchased narcotics a significant number of times.  Government Exhibit 59 is a single picture of Defendant Cuevas-Martinez taken by an undercover officer with a hidden camera.  RAS recognized Defendant Cuevas-Martinez but did not know his name.

On January 16, 2008, Agent Olstad interviewed a person he referred to as "JK."  He told JK that he knew about JK's heroin use and JK's source.  JK indicated that he knew about whom Agent Olstad was referring.  Agent Olstad told JK that he wanted to show him some photographic lineups and that the person about whom they had been speaking may or may not be in the lineups.  JK identified Defendants Hernandez-Seldana, Medina-Garza, and Murguia-Garcia, without hesitation.  JK said that Defendant Hernandez-Seldana was the leader of the organization and that he had bought heroin from him many times beginning in August 2007.

Agent Olstad interviewed a husband and wife, "RDR" and "DR," together on February 12, 2008.  After the agent instructed them that the targets of the investigation may or may not be in the lineups, DR said she remembered seeing Defendant Hernandez-Seldana speaking with RDR in their store.  When she said this, RDR gave DR a "dirty look."  Agent Olstad believed this indicated RDR's displeasure that DR was talking about his heroin use.  When RDR was shown the lineups, he briefly glanced at them before saying that he did not recognize the person he had been talking to in the store that day.  After some further discussion about the Marcos organization, RDR asked Agent Olstad if the agent would like for him to identify any of the runners.  RDR then identified Defendant Cuevas-Martinez and Defendant Murguia-Garcia without hesitation.  RDR said he had bought heroin from Defendant Cuevas-Martinez about

twelve to fifteen times and from Defendant Murguia-Garcia about four or five times.

On February 26, 2008, Agent Guyse interviewed a witness he identified as "RJH." Agent Guyse told RJH that he was a subject of a federal wiretap, and that Agent Guyse believed he was purchasing narcotics. Prior to showing RJH any lineups, Agent Guyse told him that the target of the investigation may or may not be in the lineups. Without hesitation, RJH identified Defendant Hernandez-Seldana from Exhibit 53 and said he had purchased heroin directly from him a few times, months ago. RJH also recognized Defendant Murguia-Garcia from Exhibit 54 as someone from whom he had purchased heroin.

On March 7, 2008, Agent Guyse interviewed a witness he identified as "AVR." He instructed AVR that the person under investigation may or may not be in the lineups. AVR immediately identified Defendant Hernandez-Seldana in Exhibit 53 and said he bought heroin from Defendant Hernandez-Seldana a few times in the summer of 2007. AVR also identified Defendant Medina-Garza in Exhibit 56, without hesitation, from prior heroin transactions.

Agent Olstad interviewed a witness identified as "CVS" on March 7, 2008. CVS identified Defendant Hernandez-Seldana in Exhibit 53 as someone from whom he had purchased heroin recently and more than once. Although CVS initially could not decide whether he had purchased heroin from the person pictured in photograph number four or photograph number five, he decided on number four, which is the photograph of Defendant Hernandez-Seldana. CVS explained that he recognized Defendant Hernandez-Seldana's striped shirt and facial shape.

On March 11, 2008, Agent Guyse interviewed "JMH." After Agent Guyse instructed JMH that the target of the investigation may or may not be in the lineups, JMH identified Defendant Hernandez-Seldana and Defendant Murguia-Garcia as individuals from whom she

11

had purchased heroin.  JMH said she had bought heroin from Defendant Hernandez-Seldana

thirty times and from Defendant Murguia-Garcia many times, all in December 2007.

## III.    DISCUSSION

### A.    Probable Cause for the Search Warrants

Defendants Hernandez-Seldana, Cuevas-Martinez, Medina-Garza, and Nguyen seek

suppression of evidence obtained from the execution of nine search warrants.[2]  They contend that

the warrants lacked probable cause.

Probable cause for a search warrant "exists if, based upon a common-sense consideration

of all the circumstances set forth in the supporting affidavit, 'there is a fair probability that

contraband or evidence of a crime will be found in a particular place.'"  United States v. Curry,

911 F.2d 72, 75 (8th Cir. 1990) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  When an

issuing court relies solely on an affidavit to determine whether probable cause exists for a

warrant, the reviewing court may consider "only that information which is found within the four

corners of the affidavit . . . in determining the existence of probable cause."  United States v.

Leichtling, 684 F.2d 553, 555 (8th Cir. 1982).

The master affidavit in this case set forth in explicit detail the basis to believe that

contraband or evidence of a crime would be located at the Fridley residence, the Brooklyn Park

residence, and the seven vehicles associated with the Marcos organization.  In the affidavit,

Agent Guyse began with an overview of the Marcos organization and its system of dispatchers,

distributors, and runners.  He explained that members of the Marcos organization almost always

---

[2] As none of the parties has addressed the issue of standing, the Court will proceed
directly to the merits.

used vehicles to store and transport controlled substances. Surveilling officers had observed Defendant Hernandez-Seldana driving the maroon Cadillac to deliver heroin and to visit several suspected narcotics stash houses. The maroon Cadillac had also been observed parked in front of a narcotics dispatch center and a stash house. Officers had seen the black Saturn at the location of two suspected drug transactions, parked in front of the dispatch center, and parked at a former stash house. The blue Taurus had been seen parked in front of a dispatch center. Officers had connected the green Ford Contour to the Marcos organization because the car had been used in four drug transactions and three controlled buys, as well as parked at a suspected stash house. The Marcos organization had used the gold Mazda 626 in six suspected drug transactions and four controlled buys. Officers had seen the black Ford Escort at the location of four suspected drug transactions, two controlled buys, and one suspected stash house. The white Ford Expedition had been observed parked in front of a former stash house and on the property of the narcotics dispatch center.

Agent Guyse also explained in his affidavit that officers had determined that Defendant Hernandez-Seldana lived at the Fridley address, based on latitude and longitude readings from the target telephone, the location of several suspected vehicles at that address, information obtained over the wiretap, and documents from Xcel Energy. Agent Guyse explained that officers had learned about the Brooklyn Park stash house from information intercepted on the wiretap, the location of several suspected vehicles at that address, a connection with the Fridley residence, and surveillance.

After reviewing Agent Guyse's affidavit, the Court finds that abundant probable cause supported the nine search warrants at issue.

B.     **Probable Cause for the Arrests of Defendants Cuevas-Martinez and Nguyen**

Defendant Cuevas-Martinez and Defendant Nguyen move to suppress evidence seized

from them incident to their arrests, arguing that they were arrested without probable cause.

Defendant Nguyen was arrested pursuant to a federal arrest warrant issued after he was

indicted by a grand jury.  The Fourth Amendment's probable cause requirement for an arrest is

satisfied when a grand jury returns an indictment.  Kalina v. Fletcher, 522 U.S. 118, 129 (1997)

(citations omitted).  Consequently, Defendant Nguyen's probable cause challenge to his arrest is

without merit.

Defendant Cuevas-Martinez was arrested during the execution of the search warrant at

6215 64th Avenue North in Brooklyn Park, Minnesota.  The officers knocked and announced

their presence, in both English and Spanish, and waited for thirty to forty-five seconds before

they forced entry into the residence.  The Court finds that this knock-and-announce technique

was reasonable under the circumstances.  See Wilson v. Arkansas, 514 U.S. 927, 930, 934

(1995) (holding that a knock-and-announce procedure must be analyzed under the Fourth

Amendment's reasonableness standard).  Once inside, officers found Defendant Cuevas-

Martinez sleeping in an upstairs bedroom.  Agent Olstad arrested Defendant Cuevas-Martinez

because he recognized him from surveillance video of controlled buys in which Defendant

Cuevas-Martinez sold drugs.

"The Fourth Amendment requires that a warrantless arrest be supported by probable

cause, which 'exists when at the moment of arrest police have knowledge of facts and

circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a

prudent person that an offense has been or is being committed by the person to be arrested.'"

 United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)).  The Court finds that Agent Olstad had probable cause to believe that Defendant Cuevas-Martinez had committed a crime.  Because the arrest was lawful, Agent Olstad's search of Defendant Cuevas-Martinez incident to arrest was also lawful.  See United States v. Robinson, 414 U.S. 218, 235 (1973).

### C.    Statements Made to Law Enforcement Officers

Defendants Hernandez-Seldana, Cuevas-Martinez, Medina-Garza, Murguia-Garcia, and Nguyen have all moved to suppress statements, but only Defendant Nguyen gave a statement to a law enforcement officer.  Consequently, the Court recommends that the motions of the other Defendants be denied as moot, and the Court will limit this discussion to Defendant Nguyen's statements.

Defendant Nguyen does not challenge the sufficiency of the Miranda warning administered at his home on January 23, 2008, nor does he contest the validity of his waiver of those rights.  The Court finds that both the warning and waiver were valid, and Defendant Nguyen's initial statement to Agent Guyse should not be suppressed.

Defendant Nguyen argues that his statement to Agent Guyse after his interview with Pretrial Services should be suppressed because (1) Agent Guyse elicited the statement during a critical stage of Defendant Nguyen's prosecution, which violated his Sixth Amendment right to counsel; (2) Agent Guyse did not re-warn Defendant Nguyen of his Miranda rights before interrogating him a second time; and (3) Defendant Nguyen did not renew his waiver of his rights.

The Sixth Amendment right to counsel guarantees that "a person is entitled to the help of

a lawyer at or after the time that judicial proceedings have been initiated against him . . . ."

Brewer v. Williams, 430 U.S. 387, 398 (1977).  This right also includes a defendant's "right to waive counsel."  United States v. Abdul-Aziz, 486 F.3d 471, 474 (8th Cir. 2007).  In the case at hand, Defendant Nguyen's Sixth Amendment right to counsel attached when he was indicted. See Brewer, 430 U.S. at 398.   However, Defendant Nguyen expressly waived his right to counsel after receiving a valid Miranda warning.  Defendant Nguyen does not contest the validity of this waiver, and the Court finds it was knowingly, intelligently, and voluntarily made. Because a defendant may waive his Sixth Amendment right to counsel just as he may waive his Miranda rights, his Sixth Amendment-based argument fails.

The remaining question is whether Agent Guyse should have re-warned Defendant Nguyen of his Miranda rights and obtained a renewed waiver of those rights before speaking with him after the Pretrial Services interview.  Defendant Nguyen relies primarily on a case from the Third Circuit Court of Appeals, United States v. Pruden, 398 F.3d 241 (3d Cir. 2005), which held that a defendant effectively waived his right to counsel before a second interrogation because the officer reminded him of his Miranda rights beforehand.  Id. at 247-48.  Pruden did not hold, however, that an officer must always remind a defendant of his rights before interrogating him a second time.  Rather, Pruden suggested that a court should ask two questions in determining whether a lapse in time invalidated a previous Miranda waiver: (1) whether the defendant understood his rights in the first instance, and (2) whether anything occurred in the interim which nullified the defendant's ability to fully consider the effect of the waiver.  Id. at 246-47 (quotation omitted).

In the case at hand, Defendant Nguyen clearly understood his rights upon being advised

16

of them.  He did not appear to be under the influence of drugs or alcohol, and he appropriately answered questions.  On the way to the courthouse, Defendant Nguyen engaged in casual conversation with Agent Guyse.  There is absolutely no evidence in the record to suggest that Defendant Nguyen did not understand his rights.  Similarly, nothing occurred between the initial waiver and the post-interview interrogation to negate the waiver.  Although four hours passed between the waiver and the second round of interrogation, the passage of time alone does not invalidate a waiver.  See Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (holding that a five-hour break between interviews did not invalidate a waiver).  In addition, Defendant Nguyen had been arrested, and was therefore in custody, before he was warned of and waived his rights the first time; thus, transporting him to the courthouse did not effect a change in his custodial status.  Accordingly, the Court finds that Agent Guyse was not required to re-advise Defendant Nguyen of his Miranda rights before speaking with him after the Pretrial Services interview. The Miranda warning remained in effect, and Defendant Nguyen nevertheless knowingly, intelligently, and voluntarily waived his rights, including his right to counsel, by speaking with Agent Guyse a second time.

**D.      The Wiretaps**

Defendants Hernandez-Seldana, Cuevas-Martinez, Murguia-Garcia, and Nguyen move to suppress the intercepted wire communications.  They submit that the wiretaps were not necessary, that the affidavits failed to establish probable cause, that certain procedures such as minimization were not followed, and that law enforcement failed to cease monitoring when the objectives of the investigation were achieved.

17

1.      **Probable Cause**

"The probable cause required for allowing electronic interception of wire communications is the same as that required by the Fourth Amendment for a search warrant." United States v. Milton, 153 F.3d 891, 894 (8th Cir. 1998). An affidavit in support of a wiretap application must include facts showing that (1) the person had committed or was going to commit a particular crime; (2) a communication pertaining to that crime would be intercepted; and (3) the targeted phone number had a nexus to the crime or was often used by the suspect. Id. In this inquiry, the Court is "bound to consider only the facts contained within the four corners of the affidavit." Id.

The Court finds that both of the wiretaps were supported by probable cause, as outlined in the corresponding affidavits. For the first wiretap, Agent Guyse's affidavit set forth numerous facts showing that ten target subjects had committed and would likely continue to commit the crimes of conspiracy to distribute, possession of, and distribution of controlled substances; operating a continuing criminal enterprise; money laundering; unlawful use of a communication facility in furtherance of a controlled substance felony; and bulk cash smuggling. Agent Guyse explained that given the Marcos organization's methods of communication and distribution, law enforcement officers expected to intercept communications pertaining to these crimes from the target telephone number. Agent Guyse also explained the nexus between the target telephone number and the criminal activity.

Agent Olstad provided similar information in his affidavit for the second wiretap. He explained that Defendant Hernandez-Seldana and his co-conspirators had committed and would likely continue to commit the crimes of conspiracy to distribute, possession of, and distribution

18

of controlled substances; operating a continuing criminal enterprise; money laundering; and unlawful use of a communication facility in furtherance of a controlled substance felony. Agent Olstad detailed several previously intercepted communications relating to that criminal activity and explained why he expected to intercept many more. Finally, he demonstrated that the target telephone number was directly related to the crimes under investigation and was frequently used by Defendant Hernandez-Seldana and other members of the Marcos organization in committing criminal activity.

### 2.    Necessity

An application for the interception of wire communications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The intent of the requirement is "to restrict wiretaps to those which are necessary as well as reasonable." United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976). However, "Congress did not require the exhaustion of 'specific' or 'all possible' investigative techniques before wiretap orders could be issued." Id. (citation omitted). The Eighth Circuit views the purpose of the necessity requirement as an assurance "that wiretaps are not routinely employed as the initial step in an investigation." United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990) (citing Daly, 535 F.2d at 438). Thus, while law enforcement officers must first attempt some typical investigative techniques, they are not required to exhaust all possible investigative techniques. Id. (citations omitted).

Here, the police did not use the wiretaps as the initial step in this investigation. Investigating officers had been conducting surveillance, interviewing informants, setting up

controlled buys, and working undercover since May 2007. As Agents Guyse and Olstad explained in their respective affidavits, they did not seek authorization for the wiretaps until other investigative techniques had been tried and failed or deemed reasonably unlikely to succeed. The Court finds that the wiretaps were necessary.

### 3.    Minimization

Under 18 U.S.C. § 2518(5), surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." Whether wiretap monitors adequately minimize non-pertinent calls is a question of objective reasonableness. Macklin, 902 F.2d at 1328. Defendants have not provided any evidence, legal authority, or argument that the minimization procedure in this case was not objectively reasonable. The only evidence before the Court is that the monitors were permitted to listen to a call for up to two minutes in order to determine whether it was criminal in nature. When the call neared two minutes in length, or if the monitor determined that the call was not pertinent, he or she minimized the call. Monitors were permitted to spot-check ongoing, minimized conversations to ascertain whether they had become criminal in nature. This minimization procedure has been "reviewed favorably" by the Eighth Circuit. See United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995) (citing United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990); United States v. Losing, 560 F.2d 906, 909 n.1 (8th Cir. 1977); Daly, 535 F.2d at 441-42). The Court finds that the minimization procedure employed in this case was objectively reasonable.

### 4.    Cessation of Monitoring

No interception may be authorized longer than is necessary to achieve the authorized

objective of the wiretap or for more than thirty days.  18 U.S.C. § 2518(5).  Defendants have not explained the basis for their position that monitoring should have ceased before it did.

With respect to the first wiretap, the authorized objectives were never fully achieved, as shown by Mr. Schleicher's periodic reports and Agent Olstad's subsequent affidavit explaining the need for a second wiretap.  Nevertheless, law enforcement agents ceased intercepting calls after thirty days, as required by § 2518(5).  As to the second wiretap, the authorized objectives were achieved on December 20, 2007, when the search warrants in this case were executed. Even though the thirty-day period had not expired, agents ceased monitoring in compliance with § 2518(5).

### E.    Eyewitness Identifications

Defendants Hernandez-Seldana, Cuevas-Martinez, and Medina-Garza move to suppress eyewitness identifications on the ground that the photographic lineups were unnecessarily suggestive.

In assessing the constitutionality of a photographic lineup, a court must first determine whether the identification procedure was "impermissibly suggestive" and, if it was, then inquire whether that procedure was nonetheless reliable.  United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003) (internal citations omitted).  In the present case, the Court finds that the identification procedure was not suggestive.  Exhibits 53, 54, 55, and 56 each consist of six photographs of men with similar features.  There were no markings or identifying information on the lineups.  The interviewing agents informed each witness of the general nature of the investigation and said that the subject of the investigation may or may not be in the lineups.  The agents did not prompt the witnesses or otherwise suggest a particular result.

Even assuming that the identification procedure was impermissibly suggestive, the identifications were nevertheless reliable.  In assessing reliability, courts balance five factors: "'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'"  Id. at 567 (internal citation omitted).  In this case, the witnesses had viewed Defendants face-to-face during drug transactions.  There is no evidence regarding the attentiveness factor.  Generally, the witnesses expressed no uncertainty or hesitation in their identifications of Defendants, and the few hesitations were brief and quickly resolved.  The factor pertaining to the accuracy of any prior descriptions does not apply here.  Finally, the officers had learned about each of the witnesses from wiretap interceptions during the time period from October through December 2007, and thus, the identifications occurred within a few months of when each witness had last purchased heroin from the relevant defendant.

As for the single photographs that were shown to RAS, such a procedure is inherently suggestive.  See id. at 566-67.  The Court therefore turns to the question of whether the procedure was nevertheless reliable.  Id. at 567.  RAS had ample opportunity to view both Defendant Murguia-Garcia and Defendant Medina-Garza face-to-face, having bought heroin from Defendant Murguia-Garcia about 100 times and from Defendant Medina-Garza a large number of times.  The Court has no evidence regarding RAS's degree of attention, and the accuracy of prior descriptions is not relevant here.  RAS demonstrated absolute certainty of the identifications, and the time between the drug transactions and the identifications was a few months at most.  The Court concludes that RAS's identifications of Defendant Murguia-Garcia

and Defendant Medina-Garza from the single photographs were reliable despite the suggestive procedure.

### F.    Defendant Nguyen's Motion to Dismiss the Conspiracy Count

Defendant Nguyen argues that the conspiracy count should be dismissed because the Government has no evidence that he knew about the objective of the conspiracy. It is well-established that insufficient evidence is not a basis for dismissal of a facially valid indictment. See Costello v. United States, 350 U.S. 359, 363-64 (1956).  Consequently, Defendant Nguyen's motion to dismiss the conspiracy count for insufficient evidence should be denied.

Based on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant Christian Hernandez-Seldana's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 57) be **DENIED**;

2.    Defendant Christian Hernandez-Seldana's Motion to Suppress Statements (Doc. No. 58) be **DENIED AS MOOT**;

3.    Defendant Christian Hernandez-Seldana's Motion to Suppress Government Interception of Wire or Oral Communications (Doc. No. 59) be **DENIED**;

4.    Defendant Christian Hernandez-Seldana's Motion to Suppress Eyewitness Identifications (Doc. No. 61) be **DENIED**;

5.    Defendant Ramiro-Cuevas's Motion to Suppress Statements (Doc. No. 84) be **DENIED AS MOOT**;

6.    Defendant Ramiro-Cuevas's Motion to Suppress Evidence from Search and

Seizure (Doc. No. 85) be **DENIED**;

7.    Defendant Ramiro-Cuevas's Motion to Suppress Witness Identifications (Doc. No. 86) be **DENIED**;

8.    Defendant Ramiro-Cuevas's Motion to Suppress Wiretap Evidence (Doc. No. 88) be **DENIED**;

9.    Defendant Eddy Medina-Garza's Motion to Suppress Eyewitness Identifications (Doc. No. 42) be **DENIED**;

10.    Defendant Eddy Medina-Garza's Motion to Suppress Evidence Obtained from Search and Seizure (Doc. No. 46) be **DENIED**;

11.    Defendant Eddy Medina-Garza's Motion to Suppress Statements (Doc. No. 47) be **DENIED AS MOOT**;

12.    Defendant Feliz Murguia-Garcia's Motion to Suppress Statements (Doc. No. 67) be **DENIED AS MOOT**;

13.    Defendant Feliz Murguia-Garcia's Motion to Suppress Evidence Derived from Electronic Surveillance (Doc. No. 68) be **DENIED**;

14.    Defendant Phat Minh Nguyen's Motion to Suppress (Doc. No. 91) be **DENIED**;

15.    Defendant Phat Minh Nguyen's Motion to Dismiss Conspiracy Count (Doc. No. 92) be **DENIED**;

16.    Defendant Phat Minh Nguyen's Motion to Suppress Statements (Doc. No. 98) be **DENIED**; and

17.     Defendant Phat Minh Nguyen's Motion to Suppress Wiretap Evidence (Doc. No.

101) be **DENIED**.


Dated: March 21, 2008

       s/ Susan Richard Nelson
      SUSAN RICHARD NELSON
      United States Magistrate Judge


Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 7, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.